2015 IL App (2d) 120856
No. 2-12-0856
Opinion filed March 9, 2015

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) )  ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 09-CF-3944 |
| KENNETH LEE PAYNE, JR., | ) ) | Honorable Gary V. Pumilia, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUDSON delivered the judgment of the court, with opinion.
Presiding Justice Schostok and Justice Zenoff concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial in the circuit court of Winnebago County, defendant, Kenneth Lee Payne, Jr., was found guilty of aggravated vehicular hijacking (720 ILCS 5/18-4(a)(1) (West 2008)) and aggravated battery (720 ILCS 5/12-4(b)(10) (West 2008)). The trial court sentenced defendant to a term of 20 years' imprisonment for aggravated vehicular hijacking and a concurrent 5-year term of imprisonment for aggravated battery. On appeal, defendant raises two distinct issues. First, defendant argues that defense counsel was ineffective for failing to move for the charges against him to be dismissed under the speedy-trial provisions of the Interstate Agreement on Detainers (730 ILCS 5/3-8-9 (West 2008)). Second, defendant argues that he is entitled to a new trial because, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), the State

used a peremptory challenge to strike a prospective juror on the basis of race. For the reasons that follow, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3     On December 17, 2009, defendant was charged with one count of aggravated vehicular hijacking (720 ILCS 5/18-4(a)(1) (West 2008)), one count of aggravated battery of a senior citizen (720 ILCS 5/12-4.6(a) (West 2008)), and one count of aggravated battery (720 ILCS 5/12-4(b)(10) (West 2008)). The charges stemmed from an incident that occurred at a McDonald's restaurant in Rockford on the evening of October 19, 2009.

¶ 4     When the indictment was filed, defendant was serving a sentence in the Wisconsin Department of Corrections, based on a parole violation and a charge of possession of a controlled substance in that state. On January 27, 2010, officials from the Wisconsin Department of Corrections authored a letter to the Winnebago County State's Attorney's office. The letter stated that the Wisconsin Department of Corrections had received a "Warrant" in defendant's case and was treating it as a detainer. Attached to the letter were: (1) a written request from defendant dated January 26, 2010, for a final disposition of the untried charges in Illinois; (2) a notice that defendant was imprisoned in the Dodge Correctional Institution in Waupun, Wisconsin; (3) a certificate of his offender status; and (4) an offer to deliver temporary custody of defendant. The letter was sent to the Winnebago County State's Attorney's office by certified mail and received by that office on February 1.[1] The letter also indicated that it was "carbon copied" to the "Winnebago County Clerk of Circuit Court."

---

[1] The copy of the letter received by the Winnebago County State's Attorney's office is stamped as being received on "February 1, 2009." We presume, and the parties do not dispute, that the actual date of receipt was February 1, 2010, or five days after the date of the letter.

¶ 5    Defendant's first appearance in Winnebago County was on May 12, 2010. At that time, William Weatherly, an assistant public defender, was appointed to represent defendant. Continuances were agreed to by defense counsel from the date of defendant's first appearance through October 27, 2010. On October 27, 2010, defense counsel announced that defendant wished to set his case for trial. The State requested December 6 as the trial date, but defense counsel stated that he was not available on that date. The court then set a trial date of January 3, 2011. The parties agreed that the time between October 27 and December 6, 2010, would be attributed to the State and that the time from December 6, 2010, through January 3, 2011, would be attributed to defendant. On January 3, 2011, defendant filed a motion to suppress identification evidence and a motion to suppress statements. Between January 3, 2011, and April 27, 2011, defense counsel sought and obtained continuances of the trial date. On April 27, 2011, defendant informed the court that he wished to proceed *pro se*. After admonishing defendant, the court granted defendant's request. The case was then continued on defendant's motion to May 11, 2011.

¶ 6    On May 11, 2011, defendant initially indicated that he wanted to "[c]ontinue with [his] 120"(speedy-trial period) and set the case for trial. Defendant stated that he intended to waive a hearing on the motion to suppress identification evidence but that he still wished to pursue the motion to suppress statements. Accordingly, the trial court continued the case to June 14, 2011, on defendant's motion and tolled the time "until after that motion [to suppress statements] is heard." On June 14, the case was continued again to June 28, 2011, due to the trial court's unavailability to hear the motion to suppress statements.

¶ 7    On June 28, 2011, defendant informed the court that he wanted to withdraw the motion to suppress statements and "just continue with [his] 120." Upon the State's request, the court set a

trial date of July 18, 2011. On July 14, 2011, the State sought a continuance of the trial date to August 15, 2011, due to its failure to serve subpoenas on two out-of-state witnesses and its recent request for DNA testing on some materials that had not yet been examined. The State acknowledged that, if the court granted a continuance, "all the time would be on [the State]." Over defendant's objection, the continuance to August 15 was granted, with a pretrial date of August 11. Also on July 14, the court granted defendant's request for an investigator to speak to a potential witness.

¶ 8    On August 11, 2011, the State answered ready for trial. The State indicated that it made "a strategic decision" to continue without the DNA information, explaining, "We don't think it will be depositive [*sic*] one way or the other and don't want to delay the case anymore, and all of our witnesses have been served." However, defendant expressed frustration over his inability to obtain the services of the investigator the court had referred to him. Defendant stated that he wanted counsel reappointed, but he requested someone other than the public defender, remarking that he had fired Weatherly because "he wasn't doing anything I'm sayin'." The court reappointed the public defender's office, and Assistant Public Defender Edward Light was assigned to the case.[2] Upon defendant's motion, the case was taken off the trial call and continued until September 14, 2011, for status. The State then indicated that, "as long as [it has] time," it was going to "go ahead and have the DNA."

¶ 9    Thereafter, the case was continued several times on defendant's motion. On January 13, 2012, defense counsel indicated that he needed some time to speak with defendant regarding the results of a Rule 402 conference (see Ill. S. Ct. R. 402 (eff. July 1, 1997)) but said that he was also requesting that a trial date be set. By agreement of the parties, a trial date of March 26,

---

[2] Light was later assisted at defendant's trial by Weatherly.

2012, was set, with a final pretrial date of March 22.

¶ 10    On March 22, 2012, the State announced that it was ready for trial. However, the State then indicated that it was not certain whether materials relating to the DNA analysis that were discoverable pursuant to Illinois Supreme Court Rule 417 (eff. Mar. 1, 2001) had been turned over. The parties also discussed whether the current trial date was "within the 120" and whether a continuance would put the case outside the speedy-trial period. Defendant expressed his belief that the case was "beyond 120 days." The court left the trial date of March 26, 2012, unchanged.

¶ 11    On March 26, 2012, both sides answered ready for trial. The State related, however, that since the date of the pretrial the prior week, it had learned that the Rule 417 materials had not been turned over to the defense. In addition, the State had learned that its fingerprint expert had located additional prints that the expert wanted to examine, but that this would delay the expert's report. Defense counsel stated that, because the Rule 417 materials were discoverable and should have been provided to the defense, the court should exclude any DNA evidence as well as the proposed new fingerprint evidence. The trial court found that it would be unfair for the State to continue to test materials and turn over the information during the course of the trial. The State said that it would then make an oral motion for a one-day continuance to give defense counsel time to absorb the Rule 417 materials.

¶ 12    The parties then discussed what dates were attributable to the State for speedy-trial purposes. The State represented that it was "still well within [its] 120." Defense counsel responded that there were two time periods at issue, the 120-day speedy-trial term (see 725 ILCS 5/103-5 (West 2008)) and the 180-day term under the Interstate Agreement on Detainers (see 730 ILCS 5/3-8-9 (West 2008)). Defense counsel noted that in January 2010 defendant, while incarcerated in Wisconsin, had caused a request for the disposition of his case to be sent to

Winnebago County and had been brought to Winnebago County on May 11, 2010. Defense counsel agreed that the State was within the 120-day speedy-trial term. The court stated that it was inclined to grant a one-week continuance but would attribute that time to the State due to the late disclosure. The case was then continued to April 2, 2012, for trial.

¶ 13 Jury selection commenced on April 2, 2012, with the trial court announcing that the parties would select jurors by questioning panels of six. After the State questioned the first panel of six, consisting of two women and four men, it excused venirepersons Deidre Tillman, an African-American female, and Jennifer Juliano, a white female. Defense counsel objected to the exclusion of the women as based on race and gender grounds, citing *Batson*. The State responded that both Tillman and Juliano "have criminal convictions." After excusing the venire from the courtroom, the parties presented further argument. At the close of this argument, the trial judge overruled the *Batson* objection to the State's peremptory strikes, finding that the State's reason for excusing Tillman and Juliano was "race neutral and gender neutral." Six jurors were selected on April 2, with the remaining six and the alternates selected on April 3. After both the jury and the alternates were selected, defense counsel renewed his *Batson* objection. Following additional argument by the parties, the trial court again overruled the *Batson* objection.

¶ 14 The matter then proceeded to trial. At the close of the trial, the jury returned verdicts finding defendant guilty of aggravated vehicular hijacking and aggravated battery. On April 20, 2012, defendant filed a motion for a new trial. On May 22, 2012, defendant filed a supplemental motion raising a *Batson* claim. A hearing was held on the motions on July 6, 2012. With respect to the *Batson* claim, defense counsel noted that he had objected to the State's use of peremptory challenges with respect to Tillman and Juliano and that defendant, an African-American, had

ended up with a jury of 12 white persons. Defense counsel argued that the State did not provide a race- or gender-neutral reason for excusing either of these members of the venire where their backgrounds and answers to questions did not distinguish them from jurors who were selected. The State responded that its notes were "sketchy" as to the reasons why it struck the two potential jurors in question, but, it said, with respect to Tillman, there was no pattern of racial discrimination where Tillman was the first potential juror struck. The State added that the majority of the jurors selected were female, so gender bias had not been shown. The court denied both motions.

¶ 15    At a hearing held on July 27, 2012, the parties agreed that defendant should be given credit against his Illinois sentence for the period from January 26, 2010, the date the detainer was entered, to July 26, 2012, a total of 911 days. After hearing argument from both sides, the court sentenced defendant to a term of 20 years' imprisonment for aggravated vehicular hijacking and a concurrent 5-year term for aggravated battery. Following the denial of his motion to reconsider the sentence, defendant filed a timely notice of appeal.

¶ 16                              II.  ANALYSIS

¶ 17                    A.  Interstate Agreement on Detainers

¶ 18    On appeal, defendant first argues that defense counsel was ineffective for failing to move for the charges to be dismissed pursuant to the 180-day speedy-trial provision of article III of the Interstate Agreement on Detainers (Agreement) (730 ILCS 5/3-8-9, art. III (West 2008)). According to defendant, such a motion would have been meritorious because, excluding delays attributable to or agreed to by the defense, more than 180 days elapsed from the Winnebago County State's Attorney's office's receipt of his request for final disposition of his pending Illinois charges to the commencement of his trial. As such, defendant asks that counsel be found

to have provided ineffective assistance and that the charges against him be dismissed with prejudice.

¶ 19    To determine whether a defendant was denied the effective assistance of counsel, we apply the two-pronged test developed in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984).  Under that test, a defendant must establish both that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant such that he was deprived of a fair trial. *Strickland*, 466 U.S. at 687; *People v. Wigman*, 2012 IL App (2d) 100736, ¶ 31.  Because a defendant must satisfy both prongs of the *Strickland* test, the failure to prove either prong precludes a finding of ineffective assistance.  *People v. Theis*, 2011 IL App (2d) 091080, ¶ 39. As a general rule, whether defense counsel provided ineffective assistance is subject to a bifurcated standard of review, in which a reviewing court defers to the trial court's findings of fact unless they are against the manifest weight of the evidence but assesses *de novo* the ultimate legal issue of whether counsel's omission establishes an ineffective-assistance claim.  *People v. Bailey*, 375 Ill. App. 3d 1055, 1059 (2007).  In this case, however, the facts relevant to our analysis of defendant's claim are undisputed, so our review is *de novo*.  *People v. Nowicki*, 385 Ill. App. 3d 53, 81 (2008).

¶ 20    In demonstrating that counsel's performance was deficient under the first prong of the *Strickland* test, a defendant must overcome the strong presumption that counsel's conduct under the circumstances constituted sound trial strategy.  *People v. Houston*, 226 Ill. 2d 135, 144 (2007).  Furthermore, with regard to the second prong of the *Strickland* test, a defendant was deprived of a fair trial when there is a reasonable probability that but for counsel's deficient performance the result of the proceeding would have been different.  *Houston*, 226 Ill. 2d at 144.

Thus, failing to move for a dismissal on the basis of a violation of the Agreement's speedy-trial provision will constitute ineffective assistance of counsel when there is at least a reasonable probability that the defendant would have been discharged had a timely motion been filed and there was no justification for defense counsel's decision not to file a motion. See *Wigman*, 2012 IL App (2d) 100736, ¶ 31 (citing *People v. Peco*, 345 Ill. App. 3d 724, 729 (2004)); *People v. Hernandez*, 345 Ill. App. 3d 163, 172 (2004); *People v. Garcia*, 251 Ill. App. 3d 473, 478-79 (1993). On the other hand, counsel's failure to assert a violation of the Agreement's speedy-trial provision cannot establish either prong of an ineffective-assistance claim if there was no lawful basis for raising a speedy-trial violation. See *Wigman*, 2012 IL App (2d) 100736, ¶ 31 (citing *People v. Phipps*, 238 Ill. 2d 54, 65 (2010)). Accordingly, we must first determine whether defendant's right to a speedy trial under the Agreement was violated before we can determine whether defense counsel was ineffective. See *Wigman*, 2012 IL App (2d) 100736, ¶ 31.

¶ 21    The Agreement is a uniform compact that has been adopted by the United States, the District of Columbia, and 48 states. *New York v. Hill*, 528 U.S. 110, 111 (2000); *Fex v. Michigan*, 507 U.S. 43, 44-45 (1993); *People v. Adams*, 2012 IL App (5th) 100088, ¶ 10. Both Illinois and Wisconsin are parties to the Agreement. 730 ILCS 5/3-8-9 (West 2008); Wis. Stat. Ann. § 976.05 (West 2008). As a congressionally sanctioned interstate compact, the Agreement is subject to federal construction. *Carchman v. Nash*, 473 U.S. 716, 719 (1985); *Adams*, 2012 IL App (5th) 100088, ¶ 10.

¶ 22    The Agreement sets forth the procedure for bringing a defendant imprisoned in one state (the holding state) to trial on charges pending in another state (the receiving state). 730 ILCS 5/3-8-9 (West 2008); *People v. Daily*, 46 Ill. App. 3d 195, 199-200 (1977). The purpose of the Agreement is to promote the expeditious and orderly disposition of detainers based on untried

charges against a prisoner and to facilitate treatment and rehabilitation in the state where the prisoner is incarcerated. *Adams*, 2012 IL App (5th) 100088, ¶ 10; *Daily*, 46 Ill. App. 3d at 198. The Agreement is to be liberally construed so as to effectuate its purposes. 730 ILCS 5/3-8-9, art. IX (West 2008).

¶ 23 The method for bringing a defendant to trial depends upon which article of the Agreement applies. Article III of the Agreement permits a prisoner to request final disposition of an untried indictment, information, or complaint. 730 ILCS 5/3-8-9, art. III (West 2008); *Daily*, 46 Ill. App. 3d at 199-200. Article IV of the Agreement allows the receiving state to request that a prisoner against whom charges are pending be made available for prosecution. 730 ILCS 5/3-8-9, art. IV (West 2008); *Daily*, 46 Ill. App. 3d at 199-200. In this case, defendant initiated the request for final disposition, so our focus is on article III of the Agreement.

¶ 24 Article III(a) of the Agreement provides in pertinent part:

"(a) Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within 180 days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint: provided that for a good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance. The request of the prisoner shall be accompanied by a certificate of the appropriate official

having custody of the prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any decisions of the state parole agency relating to the prisoner." 730 ILCS 5/3-8-9, art. III(a) (West 2008).

Section (c) of article III states that the prison officials who have custody of the prisoner "shall promptly inform him of the source and contents of any detainer lodged against him and shall also inform him of his right to make a request for final disposition" of the charges on which the detainer is based. 730 ILCS 5/3-8-9, art. III(c) (West 2008). Section (b) of article III states that the written notice and request for final disposition of the charges on which the detainer is based shall be given or sent by the prisoner to the warden, commissioner of corrections, or other prison official who has custody of him. 730 ILCS 5/3-8-9, art. III(b) (West 2008). In turn, the prison officials "shall promptly forward [the request] together with the certificate to the appropriate prosecuting official and court by registered or certified mail, return receipt requested." 730 ILCS 5/3-8-9, art. III(b) (West 2008).

¶ 25    Thus, compliance with article III of the Agreement requires the following steps. Initially, the receiving state must lodge a detainer with the holding state. 730 ILCS 5/3-8-9, art. III(a) (West 2008); *People v. Hood*, 223 Ill. App. 3d 157, 159 (1991) (noting that the provisions of article III do not apply unless the receiving state lodges a detainer against a prisoner in the holding state). Prison officials in the holding state must then notify the prisoner of the detainer and of the prisoner's rights to request a final disposition of the charges upon which the detainer is based. 730 ILCS 5/3-8-9, art. III(a), (c) (West 2008). The prisoner must then deliver to the prison official having custody of him a written notice of the place of imprisonment and a request

for a final disposition of any pending charges. 730 ILCS 5/3-8-9, art. III(a), (b) (West 2008); *Daily*, 46 Ill. App. 3d at 201. Finally, the prison official is required to promptly forward the prisoner's request and a certificate describing the details of the prisoner's incarceration to the appropriate prosecuting official and the court by registered or certified mail, return receipt requested. 730 ILCS 5/3-8-9, art. III(b) (West 2008); *Daily*, 46 Ill. App. 3d at 201. The prisoner must be brought to trial within 180 days after "he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction" the written notice and the request for a final disposition. 730 ILCS 5/3-8-9, art. III(a) (West 2008). Absent any "necessary or reasonable continuance[s]" for "good cause," the receiving state's failure to bring the prisoner to trial within the specified time frame will result in the dismissal with prejudice of the charges against him. 730 ILCS 5/3-8-9, art. III(a), V(c) (West 2008); *Hill*, 528 U.S. at 112; *Adams*, 2012 IL App (5th) 100088, ¶ 14.

¶ 26    As noted above, defendant argues that counsel's failure to move for the charges' dismissal under the speedy-trial provision of article III of the Agreement constituted ineffective assistance of counsel. Defendant contends that there is a reasonable probability that the charges would have been dismissed, because more than 180 days elapsed from when the Winnebago County State's Attorney's office received his request for final disposition to the start of his trial. According to defendant, excluding delays attributable to or agreed to by the defense, a total of 191 days elapsed from the time he caused to be delivered to the State his request for final disposition and the commencement of his trial. Defendant calculates the 191 days as follows: (1) 100 days from February 1, 2010 (when the State received his request for final disposition), through May 12, 2010 (when he first appeared in court in Winnebago County); (2) 40 days from October 27, 2010 (when he first requested a trial date to be set), through December 6, 2010 (the

trial date requested by the State); (3) 44 days from June 28, 2011 (when defendant, then proceeding *pro se*, withdrew his motion to suppress statements and demanded trial), through August 11, 2011 (when defendant requested the reappointment of counsel); and (4) 7 days from March 26, 2012, through April 2, 2012, due to the State's request for a continuance based on its failure to fully comply with discovery and its request to examine additional fingerprints. Defendant further asserts that no justification was provided for counsel's failure to seek the charges' dismissal under the Agreement.

¶ 27 The State responds that defense counsel was not ineffective for failing to move for dismissal under the 180-day speedy-trial term set forth in article III of the Agreement. The State's argument is twofold. First, the State contends that, in calculating the 180-day speedy-trial term, defendant incorrectly includes the 100-day period commencing on February 1, 2010. According to the State, this 100-day period should not be counted, because (1) the record is silent as to what caused the delay in defendant's transfer from Wisconsin to Illinois and (2) the record does not clearly show that the Winnebago County circuit court received defendant's request for final disposition. Alternatively, the State argues that some of the delay during the period tolled the 180-day term because it occurred as a result of a continuance allowed by the trial court for "good cause shown." See 730 ILCS 5/3-8-9 (West 2008).

¶ 28 We are compelled to agree with the State and hold that defendant has failed to establish that there is a reasonable probability that the charges would have been dismissed pursuant to the Agreement had his attorney moved for dismissal prior to trial. In particular, because the record does not establish the date when defendant's request for final disposition was actually delivered to the Winnebago County circuit court, it is impossible to determine if defendant was brought to trial after the expiration of the 180-day period set forth in article III(a) of the Agreement.

¶ 29 The record establishes that on January 26, 2010, defendant executed his request for final disposition of the Winnebago County charges. The following day, the Wisconsin Department of Corrections authored a letter directed to the Winnebago County State's Attorney. The letter included a copy of defendant's request for final disposition as well as a written notice of defendant's place of imprisonment, a certificate of his offender status, and an offer to deliver temporary custody of defendant. The letter also indicated that it was "carbon copied" to the "Winnebago County Clerk of Circuit Court." The Winnebago County State's Attorney's office received the correspondence by certified mail on February 1, 2010. However, the record does not reflect that the letter and its attachments were actually delivered to the clerk of the Winnebago County circuit court.

¶ 30 In *Fex*, 507 U.S. 43, the United States Supreme Court addressed whether the 180-day period set forth in article III(a) of the Agreement commences when the prisoner transmits his request for final disposition to prison officials or when the request is delivered to the prosecuting officer and the appropriate court. *Fex*, 507 U.S. at 47. Ultimately, the Court held that the 180-day period does not commence "until the prisoner's request for final disposition of the charges against him has *actually been delivered to the court and prosecuting officer* of the jurisdiction that lodged the detainer against him." (Emphasis added.) *Fex*, 507 U.S. at 52. In so holding, the Court recognized the possibility that, through negligence or malice, a prison official could postpone commencement of the 180-day period by failing to properly forward a defendant's request. *Fex*, 507 U.S. at 49-50. Nevertheless, the Court determined that a significantly worse scenario would result if the speedy-trial term commenced on the date the prisoner's request is transmitted to prison officials, because if, through an official's negligence, the prisoner's request is delivered to the court and the prosecuting officer long after the 180-day period has expired, the

prisoner's untried charges would be dismissed before the prosecuting authorities were even aware that the prisoner had requested final disposition. *Fex*, 507 U.S. at 50. The defendant in *Fex* argued that fairness requires the burden of compliance with the Agreement's requirements to be placed entirely on the law enforcement officials involved since the prisoner has little ability to enforce compliance. *Fex*, 507 U.S. at 52. The Court rejected this argument, stating that it is more appropriately addressed to the legislatures of the states that have adopted the Agreement. *Fex*, 507 U.S. at 52.

¶ 31    After the Supreme Court decided *Fex*, federal courts interpreted the decision as providing that the speedy-trial period under article III(a) of the Agreement does not commence until *both* the court *and* the prosecuting officer actually receive the request for final disposition. Thus, for instance, in *United States v. Collins*, 90 F.3d 1420, 1425-26 (9th Cir. 1996), the defendant's demand for final disposition was received by the United States Marshal on May 6, 1994. The Marshal filed a copy of the demand with the district court on May 10, 1994. The defendant argued that the speedy-trial period under the Agreement began to run on May 6, reasoning that delivery to the Marshal also constituted delivery to the district court. The *Collins* court rejected this argument, explaining that "*Fex* instructs us that the [Agreement] means what it says. And when it says that the prisoner must have his demand 'delivered to the . . . appropriate court,' that is what it means." *Collins*, 90 F.3d at 1426. The court concluded that delivery to the Marshal did not constitute delivery to the district court, because the Marshal is not an agent of the court. *Collins*, 90 F.3d at 1426. Since actual delivery to the district court did not occur until May 10, that is when the speedy-trial period began to run. *Collins*, 90 F.3d at 1426; see also *United States v. Paredes-Batista*, 140 F.3d 367, 374-75 (2d Cir. 1998) (holding that where the

defendant's request for final disposition was delivered to the district court and the prosecuting officer on different dates, the later date would commence the 180-day speedy-trial term).

¶ 32    More recently, in *United States v. Brewington*, 512 F.3d 995 (7th Cir. 2008), the court held that a prisoner's demand for a speedy trial pursuant to article III(a) of the Agreement did not trigger the 180-day period where, although his demand was received by the United States Attorney's office, it was never delivered to the district court.  The *Brewington* court acknowledged that the Agreement is to be liberally construed.  *Brewington*, 512 F.3d at 997.  Even so, the court stated that this command cannot overcome the Supreme Court's literal interpretation that the demand for final disposition is to be delivered to the prosecuting officer and the appropriate court.  *Brewington*, 512 F.3d at 997.  Moreover, relying on *Fex*, the *Brewington* court explained that although "[p]rison authorities are charged with sending the demand to the prosecutor and the court *** the prisoner bears responsibility for ensuring that his jailors follow through." *Brewington*, 512 F.3d at 997 (citing *Fex*, 507 U.S. at 49).

¶ 33    In *United States v. Washington*, 596 F.3d 777 (10th Cir. 2010), *cert. denied*, 561 U.S. 1036 (2010), the Bureau of Alcohol, Tobacco, and Firearms (ATF) lodged a detainer against the defendant, who was then incarcerated in Kansas.  The defendant, acting *pro se*, drafted a document titled " 'Final Disposition of Detainer.' "  *Washington*, 596 F.3d at 779.  The defendant then sent two copies of the document to the same mailing address, but directed one copy to the " 'Department of Justice, Issuing prosecutor' " and the second copy to the " 'Department of Justice, Court.' " *Washington*, 596 F.3d at 779.  The United States Attorney's office, which was located at the mailing address used by the defendant, received both documents. It did not forward a copy to the district court, which was located at a different address. Subsequently, the defendant submitted a request for final disposition through the Kansas

Department of Corrections (KDOC). KDOC sent the request by certified mail to the ATF. Neither KDOC nor the ATF forwarded a copy of the request to the district court. The defendant moved to dismiss the charges against him, on the basis that more than 180 days had passed since he caused to be delivered to the prosecuting officer his requests for final disposition. The district court denied the defendant's motion, and the defendant was ultimately convicted of the charges.

¶ 34 On appeal, the defendant renewed his argument that the Agreement had been violated. However, the *Washington* court held that, because actual delivery to both the prosecuting officer and the court was not accomplished, there had been no violation of the Agreement. *Washington*, 596 F.3d at 780-81. The court rejected the defendant's argument that he was entitled to relief because the United States Attorney's office should have forwarded to the district court the request addressed to the " 'Department of Justice, Court.' " *Washington*, 596 F.3d at 780-81. The court relied on *Fex*, noting that that decision expressly requires actual delivery to both the prosecutor and the court. *Washington*, 596 F.3d at 781. The court further noted that the *Fex* Court refused to carve out a "fairness" exception to the express language of the Agreement in cases in which a third party had negligently or maliciously prevented delivery from occurring. *Washington*, 596 F.3d at 781 (citing *Fex*, 507 U.S. at 50-52).

¶ 35 Various state courts have also held that the 180-day period set forth in article III(a) of the Agreement does not begin to run until the prisoner's request for final disposition is received by both the prosecuting officer and the appropriate court in the receiving state. See, *e.g.*, *State v. Dodson*, 2009 MT 419, ¶ 41, 354 Mont. 28, 221 P.3d 687 (holding that the speedy-trial provisions of the Agreement are not triggered until the prosecutor and the court receive the prisoner's request for a final disposition); *Peterson v. State*, 73 P.3d 108, 110-12 (Idaho Ct. App. 2003) (holding that 180-day period did not begin to run where prison officials forwarded the

defendant's request for a final disposition to the court clerk but not to the county prosecutor); *State v. Somerlot*, 544 S.E.2d 52, 59-60 (W. Va. 2000) (holding that 180-day period did not begin to run where prison officials forwarded the defendant's request for final disposition to the prosecutor but not to the court clerk); *Crosland v. State*, 857 P.2d 943, 945-46 (Utah 1993) (holding that 180-day period did not begin to run where the defendant's request for a final disposition was never delivered to the appropriate court and prosecuting official).

¶ 36    Here, the record suggests that Wisconsin prison officials mailed a copy of defendant's paperwork to the Winnebago County circuit clerk.  However, the record is devoid of any indication that the mailing was actually delivered to the clerk.  Given these circumstances, and in light of the clear authority cited above, we cannot determine when the 180-day speedy-trial period began to run.  Consequently, we cannot conclude that the 180-day speedy-trial provision of article III(a) of the Agreement was violated.

¶ 37    Defendant nevertheless argues that there is a legal presumption that a letter that is properly addressed, stamped, and mailed was received by the addressee.  See *City of Chicago v. Supreme Savings & Loan Ass'n*, 27 Ill. App. 3d 589, 592 (1975).  Defendant's position misses the mark.  To say that a letter is presumed to be delivered does not answer the question of *when* the letter was delivered.  It is the *date* of delivery, not just the fact of delivery, that is the critical inquiry in calculating the speedy-trial period under article III(a) of the Agreement.  See, *e.g.*, *Paredes-Batista*, 140 F.3d at 374-75; *Collins*, 90 F.3d at 1426.  Without knowing precisely when defendant's request was delivered to the circuit court, it is impossible to determine whether a violation of the Agreement occurred.  See *Morganfield v. State*, 919 S.W.2d 731, 734 (Tex. App. 1996) (noting that, in the absence of proof of when both the trial court and the prosecuting

attorney received the defendant's request for final disposition under the Agreement, the court was unable to determine when the 180-day speedy-trial term began to run).

¶ 38    Although not cited by defendant, we note that our supreme court rules provide that, "[w]hen service of a paper is required," "[s]ervice by mail is complete four days after mailing." Ill. S. Ct. R. 12(a), (c) (eff. Dec. 29, 2009).  Of course, the presumption that service by mail is complete four days after mailing applies only if the record contains proper proof of mailing.  See *Montalbano Builders, Inc. v. Rauschenberger*, 341 Ill. App. 3d 1075, 1078-79 (2003) (presuming that request to admit facts was received four days after the date that the notice of service was filed).  Illinois Supreme Court Rule 12(b)(3) (eff. Dec. 29, 2009) provides that, in case of service by mail, service is proved by "certificate of the attorney, or affidavit of a person other than the attorney, who deposited the paper in the mail ***, stating the time and place of mailing ***, the complete address which appeared on the envelope ***, and the fact that proper postage *** was prepaid."  Assuming, *arguendo*, that Rule 12 applies and that the letter from prison authorities forwarding defendant's request for final disposition under the Agreement constituted a "paper" for purposes of Rule 12 (see Ill. S. Ct. R. 2 (b)(3) (eff. May 30, 2008) (defining "paper" as a "pleading, motion, notice, affidavit, memorandum, brief, petition, or other paper or combination of papers required or permitted to be filed"), we are unable to find in the record an affidavit by either any of the prison authorities or defendant evincing compliance with the proof-of-service requirements set forth in Rule 12(b)(3).  As such, service was not proven and we cannot presume that service of defendant's request for final disposition was complete four days after mailing. See *People v. Tlatenchi*, 391 Ill. App. 3d 705, 716 (2009) (holding that the defendant's motion to withdraw guilty plea was untimely where proof of service did not comply with Rule 12(b)(3)).[3]

---

[3] Rule 12 was recently amended to provide that, in case of service by mail by a *pro se*

¶ 39    In short, we conclude that defendant has not established when the 180-day speedy-trial term under article III(a) of the Agreement began to run.  Therefore, defendant has failed to demonstrate that a motion to dismiss based on a violation of the Agreement's speedy-trial provision would have merit.  As such, we reject the notion that defendant's right to a speedy trial under the Agreement was violated.  Since defendant has not established that there is a reasonable probability that he would have been discharged had a timely motion been filed, we must reject defendant's claim that defense counsel was ineffective for failing to move for dismissal under the Agreement.

¶ 40                                B.  Jury Selection

¶ 41    Next, defendant claims that he should receive a new trial because the State used a peremptory challenge to exclude Tillman on the basis of her race.[4]   The State disputes defendant's claim, asserting that it excused Tillman for race-neutral reasons.

---

petitioner from a correctional institution, service is proved "by affidavit, or by certification as provided in section 1-109 of the Code of Civil Procedure (735 ILCS 5/1-109 (West 2012)) of the person who deposited the document in the institutional mail, stating the time and place of deposit and the complete address to which the document was to be delivered."  Ill. S. Ct. R. 12(b)(4) (eff. Sept. 19, 2014).  Of course, this provision was not in effect when defendant gave his request for final disposition to prison authorities.  Moreover, even if it had been in effect, and assuming that defendant was the party responsible for establishing service by mail, the record does not contain either an affidavit or a section 1-109 certification by defendant.  As such, this provision would afford defendant no relief.

[4] At trial, defendant also objected to the exclusion of Juliano on gender grounds.  Defendant does not renew that argument on appeal.

¶ 42    The equal-protection clause of the fourteenth amendment prohibits the State from using its peremptory challenges to exclude otherwise qualified venire members based solely on their race.  U.S. Const., amend. XIV; *Batson*, 476 U.S. at 89.  In *Batson*, the Supreme Court developed a three-step process for evaluating a defendant's claim that the State exercised a peremptory challenge in a racially discriminatory manner.  First, the defendant must make a *prima facie* showing that the State exercised a peremptory challenge on the basis of race.  *People v. Easley*, 192 Ill. 2d 307, 323 (2000).  To establish a *prima facie* case, the defendant must demonstrate that "relevant circumstances" raise an inference of purposeful discrimination based on race.  *Batson*, 476 U.S. at 96; *People v. Edwards*, 144 Ill. 2d 108, 152-53 (1991); *People v. Mayes*, 257 Ill. App. 3d 137, 143 (1993).  Among the circumstances deemed "relevant" in establishing a *prima facie* case are: (1) racial identity between the objecting party and the excluded venireperson; (2) a pattern of strikes against minority venirepersons; (3) the disproportionate use of peremptory challenges against minority venirepersons; (4) evidence of the minority representation in the venire as a whole compared to the selected jury; (5) the nonobjecting party's questions and statements during *voir dire* and while exercising peremptory challenges; (6) whether excluded venirepersons were a heterogenous group sharing race as their only common characteristic; and (7) the race of the objecting party, the victim, and the witnesses at trial.  *Mack v. Anderson*, 371 Ill. App. 3d 36, 44-45 (2006) (citing *People v. Williams*, 173 Ill. 2d 48, 71 (1996)).

¶ 43    Once a defendant establishes a *prima facie* case of purposeful discrimination, the process moves to the second step, where the burden shifts to the State to articulate a race-neutral explanation for excluding each venireperson in question.  *Batson*, 476 U.S. at 97; *Easley*, 192 Ill. 2d at 323-24.  "A race-neutral explanation is one based upon something other than the race of the

venireperson." *Easley*, 192 Ill. 2d at 324. During the second step, the trial court focuses on the facial validity of the State's explanation, and the explanation need not be persuasive or even plausible. *Easley*, 192 Ill. 2d at 324. The defendant may then rebut the State's reasons as being pretextual. *Easley*, 192 Ill. 2d at 324. At the third step, the trial court must determine whether the moving party has met its burden of establishing purposeful discrimination. *Batson*, 476 U.S. at 98; *Easley*, 192 Ill. 2d at 324. During this final step, the trial court evaluates the reasons provided by the nonmoving party as well as the claims by the moving party that the proffered reasons are pretextual. *Easley*, 192 Ill. 2d at 324; *Mack*, 371 Ill. App. 3d at 44. Because the trial court's ultimate ruling on a *Batson* claim is entitled to great deference, it will not be reversed on review unless clearly erroneous. *People v. Davis*, 231 Ill. 2d 349, 364 (2008); *People v. Hogan*, 389 Ill. App. 3d 91, 100 (2009). A determination is clearly erroneous only when a review of the entire record leaves the reviewing court with the definite and firm conviction that a mistake has been made. *Hernandez v. New York*, 500 U.S. 352, 369 (1991).

¶ 44    Tillman, an African-American female, and Juliano, a white female, were part of the first group of six venirepersons questioned during *voir dire*. Initially, the court questioned the group. The court noted that Tillman "was in some trouble before" and asked her whether "that [is] all over and done with." Tillman answered in the affirmative. The court then inquired, "Is there anything about that that would put either side here at an advantage or a disadvantage in this case?" Tillman responded "no" and further agreed that she could "put that out of [her] mind during the pendency of this case." Similarly, the court noted that Juliano was "in some trouble a long time ago." Like Tillman, Juliano indicated that she could put that experience out of her mind during the pendency of the case and that there was nothing about that experience that would advantage or disadvantage either side. During the State's questioning of Tillman and

Juliano, it briefly noted that Tillman had "some issues" with the law and that Juliano "had a problem about a dozen years ago." After questioning the remainder of the group of six venirepersons, the State used peremptory challenges to excuse Tillman and Juliano. Defendant raised a *Batson* objection. The State responded by noting that both Tillman and Juliano had criminal convictions.

¶ 45 During further argument, defendant stated that he was objecting to the exclusion of Tillman as based on racial grounds and to the exclusion of both Tillman and Juliano as based on gender grounds. Defense counsel noted that the venire consisted of 40 individuals, only 4 of whom were African-American. Defense counsel further noted that the court had already excused one of the four African-Americans for medical reasons. In response, the State reiterated that it exercised its peremptory challenges with respect to Tillman and Juliano because both women disclosed that they had criminal convictions. The State explained that it made a "tactical decision" that it did not want an individual with a criminal conviction "if [it] had the preemptories [*sic*] available to [it]." The prosecutor further remarked:

> "Every jury trial that is tried by people in my office, we run criminal histories on every person we believe may be called to a venire for the express purpose of knowing people's criminal background so that we can make a decision based on the situation of where we are with preemptories [*sic*], who's left in the venire panel whether we're going to strike people. And it is always my practice to try and eliminate people with criminal records."

At the close of argument, the trial court overruled the *Batson* objection, finding that the State's reason for exercising the peremptory challenges was both race- and gender-neutral.

¶ 46     After a panel of 12 jurors and 2 alternates was selected, defense counsel renewed his *Batson* objection. Defense counsel asserted that the State, notwithstanding its earlier claim that it would excuse any juror with a prior conviction, had accepted two white jurors, Deanna Nyman and Michael Gates, who had prior convictions. Therefore, defense counsel argued, the State's accepting Nyman and Gates "contradict[ed]" the reason the State had given for striking Tillman and Juliano. The State responded that its use of peremptory challenges was "strategic based on how many preempts [*sic*] [it] had left." The State asserted that defendant could not show a pattern of discriminatory strikes, because Tillman and Juliano were the first two venirepersons struck by the State. The State also pointed out that it accepted one African-American juror.[5] The State further responded that it was "not thrilled" to keep Gates on the jury, but that it had only one strike remaining. The State explained that it felt that it "could not afford to be left without a strike because[,] except for the fact that he had a criminal history, in all other respects, he appeared to be answering his questions appropriately." The State asserted that the same was true with respect to Nyman. The State explained that when it accepted Nyman it had only one peremptory challenge left and it "didn't feel that tactically [it] could allow [itself] to make a strike and then potentially have someone worse end up on the jury." The State noted that its concern was evidenced by Jeffrey Lierman, the last venireperson called. The State commented that it was "quite concerned" that Lierman would have ended up on the jury if it had exhausted its challenges. The trial court again overruled defendant's *Batson* objection, explaining that the situation at the beginning of jury selection is different from the situation at the end of jury selection. Accordingly, the court found that the State's reason with respect to Nyman was race-

---

[5] The African-American juror, Wanda Perry, was excused during the course of the trial for reasons not relevant to this appeal. She was replaced by an alternate.

neutral, and it determined, with respect to Gates, that it did not "much matter[]," because defendant had exercised a peremptory challenge to excuse Gates.

¶ 47    As the foregoing discussion suggests, the State offered its explanation for striking Tillman and Juliano immediately after defendant initially raised his *Batson* claim and before the trial court had an opportunity to determine whether a *prima facie* showing had been made under the first step of the *Batson* analysis.[6]   However, the court did determine that the State had an adequate race-neutral reason for exercising the peremptory challenges.  Accordingly, we need not address whether a *prima facie* case was made under *Batson* and we determine only whether the trial court erred in finding that the State's explanation for striking Tillman was race-neutral and valid.  See *Easley*, 192 Ill. 2d at 325; see also *People v. Rivera*, 221 Ill. 2d 481, 506 (2006) ("[W]hether a *prima facie* case of discrimination exists at the outset becomes a moot point after the trial court finds valid and race-neutral reasons supporting the peremptory challenge ***.").

¶ 48    The State cited two principal reasons for excluding Tillman—Tillman's criminal history and the timing of the peremptory challenge.  With respect to the first reason, the trial court correctly determined that the existence of a criminal history is a race-neutral reason for excluding a prospective juror.  See *People v. Smith*, 258 Ill. App. 3d 1003, 1024 (1994) (noting that among the jury traits that may justify a peremptory challenge is the prospective juror's "arrest record"); *People v. Lovelady*, 221 Ill. App. 3d 829, 838-39 (1991) (same); see also *Easley*, 192 Ill. 2d at

---

[6] In fact, when defense counsel suggested that he had "made the necessary first stage showing" that the State exercised a peremptory challenge on the basis of race, the trial court responded that it was not required to determine whether defendant had made a "first-stage showing," because the State had already proffered a race-neutral explanation for excluding the venirepersons in question.

324 ("A race-neutral explanation is one based upon something other than the race of the venireperson.").

¶ 49    Defendant nevertheless asserts that the State's explanation for striking Tillman was pretextual because the State later accepted two white jurors (Nyman and Gates), who also had criminal convictions.   However, the State's acceptance of Nyman and Gates does not, under existing case law, establish that its explanation for striking Tillman was pretextual.   See *People v. Hudson*, 157 Ill. 2d 401, 431 (1993).   Moreover, where a small number of peremptory challenges remains, a character trait that might have resulted in the use of a peremptory challenge at an earlier point in jury selection might no longer call for the excusal of a prospective juror sharing that characteristic.   See *People v. Taylor*, 409 Ill. App. 3d 881, 903 (2011) ("[T]he State provided an additional reason for excusing some, but not all, social workers from the venire, namely, that it had only seven peremptories and social workers were in 'abundance,' so it could not excuse every social worker.").   In this case, the State consistently asserted that its use of peremptory challenges to excuse venirepersons with criminal histories would depend on the number of peremptory challenges available to it.

¶ 50    Significantly, when defendant first raised his *Batson* objection, the State asserted that it made a "tactical decision" that it did not want an individual with a criminal conviction on the jury "if [it] had the preemptories [*sic*] available to [it]."   Subsequently, when defendant renewed his *Batson* objection immediately prior to the commencement of trial, the State reiterated that its use of peremptory challenges was "strategic based on how many preempts [*sic*] [it] had left."   The State added that it "didn't feel that tactically [it] could allow [itself] to make a strike and then potentially have someone worse end up on the jury."   As noted earlier, the trial court accepted the State's explanation, recognizing that "the situation at the beginning of jury selection

is different than the situation at the end of jury selection." The court further noted that Gates was excused by the defense and that the State's reason with respect to Nyman was race-neutral. Given the record before us, we are unable to conclude that the court's finding is clearly erroneous.

¶ 51     In this case, each party had 7 peremptory strikes to use with respect to the selection of the 12-person jury. See Ill. S. Ct. R. 434(d) (eff. May 1, 1985). The parties also had two peremptory challenges with respect to the selection of the two alternates. See Ill. S. Ct. R. 434(e) (eff. May 1, 1985) ("Each party shall have one additional peremptory challenge for each alternate juror."). With respect to the selection of the 12-person jury, the record establishes that, after the State questioned the first venire panel of 6, it exercised peremptory challenges to remove Tillman and Juliano based on their prior criminal convictions. Following the excusal of Tillman and Juliano, the State had five peremptory challenges remaining. By the time Nyman was called, the parties had selected 10 jurors and the State had exercised 3 additional peremptory challenges. Thus, the State had used five peremptory challenges, with two remaining, and the parties needed to seat two additional persons on the jury. Nyman was called in a panel with one other individual, Debra Forsell. During questioning, Nyman acknowledged that she was "in some trouble a while ago," but that it was "all over and done with." In addition, she stated that there was nothing about her experience that would put either side at an advantage or disadvantage. Forsell had a family member who had been in trouble with the law, and she hesitated when asked if she could put that matter out of her mind and decide this case on its own facts. Forsell agreed that she was having a difficult time putting her family member's experience out of her mind. She described the experience as "traumatic" and stated that she attended court proceedings in the matter. Forsell stated that, while she thought that she could put the matter out

of her mind, the court proceedings here were bringing the trauma back and she was unsure that she could be impartial. With this backdrop, the State had four choices: (1) strike both Nyman and Forsell, thereby leaving itself without any peremptory challenges; (2) strike Nyman because of her criminal history; (3) strike Forsell because she indicated that she would have a difficult time being impartial; or (4) strike neither Nyman nor Forsell. The State opted for the third option and used its sixth peremptory challenge to strike Forsell. This left the State with one peremptory challenge available, if needed, to select the last juror. Indeed, as the State explained when defendant renewed his *Batson* objection prior to trial, it "didn't feel that tactically [it] could allow [itself] to make a strike [of Nyman] and then potentially have someone worse end up on the jury." Given this record, we are unable to conclude that the State's use of the peremptory challenges evinced a discriminatory purpose.

¶ 52    The State faced a similar choice with respect to the selection of Gates. By the time Gates was called, the parties had selected 11 individuals for the 12-member jury. Gates was called with two other venirepersons, Nathan Nelsen and Lierman. Gates, Nelsen, and Lierman were questioned with three other venirepersons (Frank Azaretto, Wilma Thomas, and Amanda Browman). Azaretto was excused for cause, and Thomas became the twelfth member of the jury. The remaining four venirepersons (Gates, Nelsen, Lierman, and Browman) were potential alternates. During *voir dire*, the trial court noted that Gates was "in some trouble awhile ago" and asked whether that was "all over and done with." Gates responded in the affirmative. Gates further indicated that he could put that experience out of his mind during the pendency of the case and that there was nothing about that experience that would put either side at an advantage or disadvantage. Like Gates, Lierman also indicated that he had been "in some trouble awhile ago," but that the matter was "all over and done with." However, Lierman indicated that he did

not know if he could "get over" the beyond-a-reasonable-doubt standard, describing it as a "pretty high bar." Lierman further commented that "it seems almost impossible" to meet that standard. Despite these remarks, Lierman later indicated that he could fulfill his duty as a juror. Lierman also hesitated when the State asked him if he would judge the testimony of an African-American witness differently from that of any other witness, but he indicated that he would take the testimony of any witness "as what it is." The State used a peremptory challenge to excuse Lierman, but accepted the rest of the remaining venirepersons (Browman, Gates, and Nelsen). Thus, the State had reserved one peremptory challenge, if needed, for the selection of the last alternate. Again, we find nothing in this choice evincing a discriminatory purpose in the State's use of its peremptory challenges.

¶ 53    Defendant also argues that Tillman was questioned more than the other persons on the venire and that this demonstrates that the State was searching for a pretextual reason to dismiss her. To the extent that Tillman was questioned more than the other venirepersons, we attribute it to two factors. First, Tillman was the very first venireperson questioned. Second, the method of questioning differed from one venireperson to the next. Some members of the venire, like Tillman, were questioned individually. Others were questioned as a group and still others were questioned both individually and as a group. More important, we find that the types of questions posed to Tillman were also asked of other venirepersons throughout *voir dire*, including some by defense counsel. For instance, Tillman was asked about her profession, how she handles disagreements, what one can discern from a person's appearance, and her television-viewing habits. Similar questions were posed to other venirepersons. The State also asked Tillman what she would do if she disagreed with the law, whether she could withhold judgment until she heard all of the evidence in the case, and whether she would have any reservations about making a

judgment in the case. Again, questions of this nature were asked of other venirepersons. Furthermore, just as Tillman was also questioned about her last encounter with a police officer and whether she was satisfied with her treatment, other potential jurors were asked about previous police encounters and any treatment they received while dealing with the justice system in general. These questions addressed the ability of the venirepersons to render a verdict based on the law and the evidence, to speak their minds during deliberations if chosen, and to put aside any preconceived notions that might have come from television. Accordingly, we are compelled to reject defendant's claim that the State's questioning of Tillman demonstrated that it was searching for a pretextual reason to dismiss her.

¶ 54 Defendant also suggests that the State's proffered reason for striking Tillman was pretextual in light of the fact that, by the time of the hearing on his posttrial motion, the prosecutor could not recall her proffered reason for striking Tillman. Defendant's argument ignores the facts that Tillman was but one of seven venirepersons against whom the State exercised peremptory challenges and that the hearing on the posttrial motion was more than three months after jury selection occurred. Under these circumstances, we cannot conclude that the prosecutor's lack of recall regarding the specific reason for striking Tillman establishes that her stated reason was pretextual.

¶ 55 In sum, in light of the foregoing, we are not left with a "definite and firm conviction" that the trial court made a mistake in finding that the State's reason for using a peremptory challenge to excuse Tillman was race-neutral. Accordingly, we find that the trial court's determination that the State established a valid and race-neutral reason for excluding Tillman is not clearly erroneous.

¶ 56                                III. CONCLUSION

¶ 57   For the reasons set forth above, the judgment of the circuit court of Winnebago County is affirmed.

¶ 58   Affirmed.