No. 2-19-0909
Order filed June 6, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CF-471 |
| CHAD CONWAY, | ) ) | Honorable Linda S. Abrahamson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Jorgensen and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court properly denied defendant's claims that his trial counsel was ineffective for failing to (1) object to hearsay testimony about the results of a gunshot residue test administered to defendant, (2) argue a nonhearsay ground for admission of defendant's testimony about a witness's statement relevant to defendant's necessity defense, and (3) investigate certain witnesses who could potentially support defendant's necessity defense.

¶ 2    Following a jury trial, defendant, Chad Conway, was convicted of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2014)) and being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2014)). He filed a posttrial motion claiming that his trial attorney provided ineffective assistance of counsel. The trial court denied the motion, and defendant

appeals. We hold that none of defendant's ineffectiveness claims meet the standards of *Strickland v. Washington*, 466 U.S. 668 (1984). We thus affirm defendant's convictions.

¶ 3                                    I. BACKGROUND

¶ 4      On April 9, 2015, a grand jury indicted defendant on sixteen counts relating to a March 21, 2015, incident involving gunfire at the home of Carol Bransdor. At his October 2015 jury trial, defendant was represented by the public defender. The jury found him guilty of being an armed habitual criminal and of unlawful possession of a weapon by a felon. Defendant filed a motion for new trial and claimed that counsel should have sought a jury instruction on necessity as defendant argued that he had possessed the firearm only because he had taken a handgun from Bransdor after she acted suicidal. The trial court granted defendant's motion for a new trial, accepting defendant's argument that defense counsel was ineffective for failing to seek a jury instruction on the defense of necessity.

¶ 5      At his 2017 retrial before a jury, defendant was represented by private counsel. Bransdor was the State's first witness. She said that, in March 2015, she lived in Carpentersville with her 13-year-old son, N.M., and her 11-year-old daughter, T.M. At about 7 p.m. on March 20, Bransdor was at home playing poker with Anthony Alvarado, who, as the brother of her children's father, she considered her brother-in-law. Defendant, who was Bransdor's cousin, had been invited to her house for a celebration. Bransdor drank five or six beers during the evening and had her last beer at about 10 p.m. Her children were also at home; she sent them to bed at 9 p.m. and continued to play cards with Alvarado until 11 p.m. From 11 p.m. until about 3:30 a.m., Bransdor and Alvarado watched television.

¶ 6      At about 3:30 a.m., defendant arrived; Alvarado went with him into the kitchen. Bransdor noticed that defendant appeared intoxicated.

¶ 7        Bransdor continued watching television for a while but eventually went into the kitchen, where she found defendant and Alvarado seated at the kitchen table with a stack of money and a gun between them. Bransdor started yelling at defendant for bringing a gun into her home while her children were present. She told defendant to leave, and she put the gun in a drawer. Brandsdor and defendant started to argue. Meanwhile, Bransdor removed a $20 bill from the stack of money. Defendant said that, if she did not return the money, he would shoot the wall. Brandsdor kept the money, and defendant shot the wall. Bransdor took another $20 bill off the stack and told defendant that he was going to pay for making a hole in the wall. Defendant shot the wall again.

¶ 8        Bransdor told defendant that she was going to call the police. Defendant then grabbed her by the neck, put the gun to her forehead, and forced her to move to the couch. Defendant then yelled out to Bransdor's children, saying that they should come  to the living room to watch their mother die. Defendant repeated this statement three times. T.M. came into the hallway and begged defendant to stop. Bransdor could not remember what caused defendant to release her; all she remembered was that she got up and ran outside with T.M. Bransdor thought that Alvarado also followed. When Bransdor realized that defendant was outside, too, she ran back inside the house with T.M. and locked the doors. She told both T.M. and N.M. to lock themselves in the bathroom, and she called 911.

¶ 9        The recording of the 911 call was introduced into evidence. In the recording, Bransdor, who sounds upset, starts by giving her address. The 911 operator asks, "What's going on?" Bransdor responds, "My fucking cousin came over here and he held a gun to my head, and he shot my wall [inaudible] times." She says that "he" is "outside right now." She states that her cousin said that he was going to shoot her in front of her kids. Bransdor seems to have difficulty following the 911 operator's questions about her cousin's present location. After several queries, she says

that she had gotten him out of the house about two minutes earlier. She interrupts herself to tell someone to get into the bathroom. After a further exchange, Bransdor identified the shooter as "Chad Conway" and gave his general description. When asked what the shooter was wearing, she says, "He's got a lot of money, so pretty flashy clothes," and she recalled that he was wearing a Bears cap.

¶ 10    The operator asked Bransdor to stay on the line. Bransdor is audibly breathing hard while she waits for the operator. When the operator asked her whether the shooter has a car, Bransdor says that he was dropped off. She then stated that he was "fucked up" and seemed to be "on something." When the operator asked if Bransdor is sure that the shooter is still at her house, Bransdor seemed uncertain. The operator told her to get her "brother-in-law," Alvarado —whom she previously mentioned as present—to look outside. The operator establishes that the shooter is probably outside and on foot. Bransdor described having run outside with "the kids," the shooter following them, and then having to run back inside with the children. When asked whether the shooter still had the gun, Bransdor was initially uncertain but then discovered the gun on a counter.

¶ 11    On cross-examination, Bransdor said that, although defendant was her cousin, the two had not seen each other regularly until a few months before the incident. While defendant was shooting and holding the gun to Bransdor's head, Alvarado was yelling at him to stop.

¶ 12    Sergeant Giacomo Accomando of the Carpentersville police was dispatched in response to Bransdor's 911 call. Approaching Bransdor's house, he saw defendant, whom he recognized from prior interactions, and placed him in custody. Accomando then entered the house. Bransdor, Alvarado, and the two children were inside. A loaded .357 magnum Ruger Blackhawk revolver was on a kitchen counter. The gun's cylinder had three spent cartridges and three live rounds.

¶ 13    N.M. testified that, at 9 p.m. on March 20, 2015, he went to his room to sleep. His mother, his sister, and Alvarado were in the house. As he attempted to sleep, he heard a male voice—not Alvarado's—saying, "Kids, come look at your mother die." N.M. looked outside of his room and saw his sister, T.M., running towards the living room. N.M. decided to hide in his room. After defendant left the house, N.M. heard his mother yell for him to hide in the bathroom, which he did.

¶ 14    T.M. testified that, on the night of the incident, she was awakened by the sound of a gunshot. She walked toward the kitchen while trying to stay hidden. In the kitchen, she saw defendant, whom she identified in court as "Chad," holding her mother down by her neck. Defendant was shouting and shot the wall. Defendant then pointed the gun at her mother's head and forced Bransdor into the living room. Defendant was still holding Bransdor by the throat. Defendant continued holding the gun to Bransdor's head and shouted, "Hey, kids, do you want to see your mother die[?]" Defendant said this three or four times. T.M. stood up from where she was hiding behind the couch and started crying. Alvarado was in the kitchen at the time. Alvarado then went to the living room to try and calm defendant down; he separated defendant and Bransdor, and convinced defendant to allow Bransdor and T.M. to go outside.

¶ 15    Sergeant Jorge Gonzalez of the Carpentersville police testified that, on March 21, 2015, at about 3:48 a.m., he was dispatched in response to a report of shots fired on Papoose Road and arrived in time to see defendant detained. Once defendant was in handcuffs, Bransdor came out of the house yelling that there was still a gun in the house. Gonzalez spoke to Bransdor, T.M., and N.M., all of whom were upset. Alvarado "wasn't cooperative" and "didn't want to talk to the police."

¶ 16    Gonzalez participated in intake procedures for defendant. He found "a little more" than $500 on defendant's person. Defendant also had a cell phone, a lighter, cigarettes, and a digital scale in his possession. Carpentersville police officers placed defendant in an interview room. They "attempt[ed]" to perform a gunshot residue (GSR) test on his hands, but defendant resisted by, variously, holding his hands flat to the table, holding his hands against his body, and balling his hands into fists. When more officers arrived to assist, defendant cooperated. Officers obtained and took custody of a test sample.

¶ 17    On cross-examination, defense counsel asked Gonzalez about the result of the GSR test. The State objected that this was hearsay. The court overruled the objection and allowed Gonzalez to testify about the testing procedure and its result: it was negative.

¶ 18    On redirect examination, the following exchange about the GSR test results occurred:

"Q. Now, you, as the lead investigator of this case, you learned that there was something that happened with the GSR kit, correct?

* * *

A. It was sent to the lab. It came back as negative. And we were informed by the lab that those kits that we used are not reliable."

Defense counsel objected that there was no foundation for the suggestion that Gonzalez spoke with the lab. The court agreed and sustained the objection. On further questioning, the State established that Gonzalez had spoken to Detective John Steinhable, who in turn had spoken to someone at the lab who said "that the [GSR] kits were faulty." Defense counsel objected to this as hearsay, but the court overruled the objection. The State then asked, "And so, based on your experience and what you know as a lead investigator in this case, the GSR kit didn't work?" Gonzalez agreed with that statement.

¶ 19    Detective Steinhable, a sergeant with the Carpentersville police, agreed with Gonzalez concerning defendant's efforts to resist the GSR test. The State asked whether Steinhable had spoken to the lab about the specific GSR kit used for the test. Defense counsel again objected based on foundation. The court sustained the objection. The State then established that, some months after the kit was sent for testing, Steinhable spoke to "Bob Burke," who had run the GSR test at the lab. Burke told Steinhable that the kits the Carpentersville police were using did not work well and should be discarded.

¶ 20    On cross-examination, Steinhable testified to what Burke specifically said about the GSR kits:

> "[Burke] sa[id], that the stuff doesn't stick to the little sticky pads inside [the kit]. He said there was one little molecule on there, but he can't testify to it. But he said when he hit it with the laser, it blew off."

Steinhable further testified that he did not perform a GSR test on Bransdor's hands.

¶ 21    The State introduced certified copies of defendant's 1998 conviction of burglary and his 2006 convictions of unlawful delivery of a controlled substance, a Class X felony, and theft.

¶ 22    Defendant testified in his defense. He said that he had known Bransdor for most of his life and had started socializing with her regularly once he moved into her neighborhood. He and Alvarado were friends and socialized on weekends. He had made efforts to get Alvarado to testify, including hiring an investigator to serve him with a subpoena, because Alvarado was "the only one else that was there that knows exactly what happened."

¶ 23    Defendant testified that, on March 21, 2015, at about 3:15 or 3:30 a.m., he was socializing with friends when Alvarado contacted him via Snapchat. Alvarado sounded "panicky." Over the

State's objection, the court allowed defendant to testify that Alvarado told him that Bransdor was drunk, threatening suicide, and had "already shot a gun off in the house."

¶ 24    Defendant went to Bransdor's house. On arriving at the door, he heard a "commotion." He went inside and saw Bransdor in the kitchen. She was "hysterical," "yelling, screaming, just real angry-like." He could tell that she was intoxicated because he had seen her intoxicated at least a dozen times. When she was intoxicated, she was "very mouthy," "drama orientated," and "always trying to pick fights." She grabbed a gun out of a drawer and, while apparently trying to shoot it through a window, she instead, shot the wall twice. He tackled her. On the ground, he held her with one arm near her neck while he squeezed the hand that held the gun. She dropped the gun. He then shouted at her, and asked her if she planned to shoot everyone who was there. He picked up the gun and stood up. Bransdor got up, yelling profanities at him, and struck him several times in the face. He "took her straight back down." He held her down with his hand on her throat and chest area.

¶ 25    Defense counsel asked defendant whether, when he pinned her the second time, Bransdor said anything to suggest that she was suicidal. The State objected to the question as calling for hearsay. Defense counsel responded:

> "I think this *** goes to necessity and why he brought her down. I think I should be able to get into what she was doing and saying that prompted him to grab her."

The trial court sustained the objection.

¶ 26    Defense counsel continued the line of questioning without asking defendant about Bransdor's statements:

> "Q. Okay. So after the second time after you brought her down to the floor, what did you do?

A. Second time I brought her down to the ground, we were yelling and screaming at each other and I told her: You got your kids here. If you are going to do this, at least tell them, show them what you are going to do.

Q. Then what did you do?

A. I called the kids out.

Q. What specifically did you say to the kids?

A. I said: Come out, watch—your mom wants to kill herself, come watch her do it."

¶ 27 Defendant testified that, when he saw T.M. come out into the hallway, he dropped the gun by Bransdor and said, "[O]kay, there they are, go ahead and do it." He then walked out the door. The police arrived. While defendant was trying to explain to the officers what happened, they handcuffed him. The police transported him to the station and took him to an interview room. They gave him "a hard time," and handcuffed him to a table. They said that they were going to force him to take a GSR test. At first, defendant did not cooperate, as he wanted to give the police "a hard time" in return. Eventually, he told them, "[W]ell, go ahead and do it," and he placed his hands on the table.

¶ 28 Defendant testified that he did not own a gun and did not bring one to Bransdor's house. According to defendant, when he took the gun from Bransdor, he did not put it to her head. He did not shoot the gun or try to shoot Bransdor,and denied choking her. Although defendantt had been drinking, he felt he remembered the night's events clearly.

¶ 29 On cross-examination, defendant explained that he did not hand the gun to Alvarado after taking it from Bransdor because the situation unfolded "so fast." He left the gun behind in the house because he did not believe that Bransdor had any intention of shooting herself. Once

Bransdor hit him in the face, he was angry. The kind of behavior he saw that night was typical of Bransdor.

¶ 30    Defendant acknowledged that he had made phone calls from jail asking others to offer Bransdor money not to testify against him. He also wanted Alvarado to testify and offered him money to do so. Defendant sent copies of the police reports as well as his written version of the incident because he wanted them to know "the truth."

¶ 31    The court agreed to give defendant's proposed jury instruction on the defense of necessity. During deliberations, the jury listened to the 911 call twice. On February 22, 2017, the jury found defendant guilty of unlawful possession of a weapon by a felon and of being an armed habitual criminal.

¶ 32    On April 4, 2017, defense counsel filed a posttrial motion raising various claims. On April 24, 2017, defendant filed a *pro se* motion seeking a new trial because he had been denied the effective assistance of counsel. See *People v. Krankel*, 102 Ill. 2d 181 (1984). Two days later, defendant filed an amended *pro se* motion for a new trial, incorporating the ineffectiveness claims of his original *pro se* motion and adding a request that the jurors be polled because they might have misunderstood the necessity defense.

¶ 33    The court appointed conflict counsel to represent defendant on his ineffectiveness claim. Appointed counsel then filed an amended motion for new trial.  The motion argued that defendant's attorney at his second trial, Teresa McAdams (hereinafter, "trial counsel"), was ineffective for (1) failing to seek a continuance when Alvarado failed to appear at the start of the trial; and (2) failing to investigate and find Eric Eskildsen, a witness who could impeach Bransdor. Defendant asserted that, before his first trial, Eskildsen had informed a public defender investigator that Bransdor had told him that the gun was already in the house when defendant arrived. The

motion included multiple exhibits including (1) an affidavit from trial counsel; (2) a memorandum from Tracy Newcomer, an investigator for the public defender who represented defendant at his first trial; (3) an affidavit from Alvarado; (4) an affidavit from trial counsel's investigator, Miriam Torres; and (5) a written statement from Eskildsen.

¶ 34    In her affidavit, trial counsel averred that, when defendant's trial was over, she spoke to the jurors and learned that they discussed the necessity defense at length. They decided on a guilty verdict because, while it may have been necessary for defendant to take the gun from Bransdor, it was unnecessary for him to retain it; rather, he should have given the gun to Alvarado.

¶ 35    In his affidavit, Alvarado averred that, on the night of the incident, he had asked defendant to come to Bransdor's house via Snapchat to calm Bransdor down. When defendant arrived, Bransdor started screaming at him. Tired of the situation, Alvarado went outside to smoke. He then heard what he thought were two gunshots. Defendant came out of the house about a minute later.

¶ 36    In her affidavit, Torres averred that she went with trial counsel to Alvarado's house to talk with him. They spoke for about ten minutes. His manner was evasive, and he stated that the case had "caused a lot of family drama." However, he did say that Bransdor was lying and that defendant was telling the truth. He could not talk further at the time but was willing to reschedule. He gave Torres a cell phone number and accepted a subpoena. However, Torres was unable to reach him at that phone number; she called him multiple times during the next week and left multiple voicemail messages. After a week, the number was disconnected.

¶ 37    In her memorandum, Newcomer stated that Eskildsen, who was both defendant's and Bransdor's cousin, had told Newcomer in a July 2015 phone conversation that Eskildsen had

spoken to Bransdor about two weeks after the incident. Bransdor told Eskildsen that the gun involved in the incident was in her kitchen drawer when defendant came to the house.

¶ 38    In his statement, Eskildsen wrote, "I heard [Bransdor] [*sic*] the gun was already in the kitchen drawer befoe [*sic*] [defendant] got there. I also heard [Alvarado] say that [Bransdor] was the one that took the gun from the drawer."

¶ 39    At the hearing on the second amended motion for a new trial, appointed counsel called trial counsel as a witness. Trial counsel testified that defendant had retained her at least several months before the date of his second trial. Her preparation for the trial included discussions about Alvarado and Eskildsen with the public defender who represented defendant at his first trial. Trial counsel also interviewed Alvarado at his house.

¶ 40    Trial counsel testified that her investigation had not left her with enough information to have a good sense of what Alvarado would say if called to testify. Based on what defendant told her, she expected Alvarado to corroborate defendant's testimony. After Torres failed to reach Alvarado at the phone number provided, trial counsel sent Alvarado letters; the post office did not return any of the letters as undeliverable. One of the letters advised Alvarado that he was under subpoena for a continued trial date and asked him to contact her. She also asked defendant whether his family members could help her get in touch with Alvarado. Her impression from the first interview was that Alvarado probably would not answer the door if she went to his house again. She told defendant that she would not call Alvarado as a witness unless she could talk to him further.

¶ 41    Concerning Eskildsen, trial counsel expected him to testify that Bransdor had told him that the gun was already in the house. She had read the public defender's proffer of Eskildsen's intended testimony at defendant's first trial. (Because the public defender had not confronted

Bransdor about her remark to Eskildsen, the trial court had declined to permit Eskildsen to testify to the remark.) Trial counsel believed that Eskildsen's testimony would be helpful to the defense and intended to call him to impeach Bransdor. Based on what defendant told her, she believed that there would be no problem in getting Eskildsen to testify voluntarily. However, when she tried to call Eskildsen at the number defendant gave her, the call would go to a voicemail account that did not identify whose number she had called. Although she left messages, Eskildsen never called her. She told defendant that it was important that she talk to Eskildsen before the trial so that she could get the details of when he had his conversation with Bransdor. In her view, without that information, she would be unable to question Bransdor about her conversation with Eskildsen and, thus, unable to use Eskildsen's testimony to impeach Bransdor.

¶ 42    Trial counsel acknowledged that neither Alvarado nor Eskildsen appeared at trial. She did not consider sending an investigator to find Eskildsen, as defendant did not have the funds for an investigator's fees. Based on her difficulty getting Alvarado to talk to her, she doubted that he would be a cooperative witness. She had assured the State a few days ahead of trial that she would be ready on the scheduled date. The State had witnesses coming from out of state and wanted to be sure that the defense did not intend to seek a continuance. Because trial counsel believed that the trial court would deny her a continuance, she did not ask for one.

¶ 43    Eskildsen testified. He confirmed that he would have testified that Bransdor had told him that the gun was in the house when defendant arrived. He said that he had stopped speaking to defendant about a year and a half before the hearing. He had heard rumors that he would not be allowed to testify because defendant was telling him what to say. He would not have picked up a call from an unknown telephone number. He did not receive any voicemail messages from trial

counsel; had he received any, he would have responded to them. He was unaware that defendant had a second trial.

¶ 44　Defendant testified that he was aware that trial counsel was having difficulty contacting Eskildsen. Defendant had asked family members to contact Eskildsen, but trial counsel assured him that "when the trial comes we are going to have everything we need to have," including Eskildsen. Two days before trial, defendant offered to send friends to look for Eskildsen, but trial counsel said that she knew "how to find people." Defendant and trial counsel had reviewed Newcomer's memo on Eskildsen's likely testimony.

¶ 45　The State introduced recordings of calls defendant placed from jail before his first trial. The court did not consider all of the calls, but only those it deemed relevant. In ruling on defendant's motion, the court summarized its impressions of the relevant calls. According to the court, defendant shared his version of the night's events with both Alvarado and Eskildsen on the calls. On one call, defendant said to Eskildsen that Avalrado's interview with an investigator " 'didn't do any good whatsoever,' " because Alvarado said that he was outside Bransdor's house at the critical moment. Eskildsen then "promise[d] to rattle [Alvarado's] cage and see what was in his head." Defendant commented, "[If] they can proof [*sic*] I was armed at anytime [*sic*], if [Bransdor] comes in and says she saw me with the gun, I need to have someone come in and say the opposite." On another call, Eskildsen told defendant that he would do whatever he could to "get [defendant] out."

¶ 46　The trial court denied all posttrial motions filed by defendant *pro se* or by trial counsel. The court determined that, because Alvarado and Eskildsen were not direct witnesses to what happened between defendant and Bransdor, they could not corroborate defendant's necessity

defense. Thus, the court concluded that trial counsel's actions concerning Alvarado and Eskildsen were neither unreasonable nor prejudiced defendant.

¶ 47 The court sentenced defendant to 25 years' imprisonment. Defendant moved for reconsideration of the sentence, the court denied the motion, and defendant timely appealed.

¶ 48                                    II. ANALYSIS

¶ 49 On appeal, defendant argues that trial counsel was ineffective by failing to (1) object to the hearsay testimony concerning the supposedly defective GSR test, (2) argue a nonhearsay basis for admission of defendant's testimony that Bransdor screamed that she wanted to kill herself, and (3) investigate Alvarado and Eskildsen as potential witnesses.

¶ 50 In response, the State argues first that trial counsel opened the door to the hearsay concerning the GSR test kits by asking whether the results were negative. It also contends that the hearsay was not prejudicial, because defendant's own testimony that he possessed the gun made the GSR test results irrelevant. Second, the State argues that defendant's testimony that Bransdor said she wanted to kill herself was, in fact, offered for the truth of the matter asserted, as the very basis of the necessity defense was that defendant possessed the gun to keep Bransdor from harming herself. The State further argues that the admitted portions of defendant's testimony made the basis of his necessity defense clear to the jury, so there was no prejudice to defendant. Third, the State argues that trial counsel did not act unreasonably concerning Alvarado and Eskildsen, because (1) she diligently sought to interview them, and (2) she appropriately concluded that it was too risky to call either one as a witness without having interviewed them first. Alternatively, the State argues that any unreasonable actions by trial counsel were not prejudicial.

¶ 51 We apply the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), to defendant's claim that he was denied his constitutional right to the effective assistance of counsel.

Under *Strickland*, a defendant must establish (1) that his counsel's performance fell below an objective standard of reasonableness and (2) that he was prejudiced by counsel's deficient performance. *Id*. at 687; *People v. Brown*, 2017 IL 121681, ¶ 25. We conclude that defendant has failed to satisfy both prongs as to any of his claims.

¶ 52    Counsel's performance is measured by "an objective standard of competence under prevailing professional norms." *People v. Evans*, 186 Ill. 2d 83, 93 (1999).

> "The court must *** determine whether, in light of all the circumstances, [counsel's] identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.

A defendant is prejudiced by counsel's deficient performance only if he or she can show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

¶ 53    Generally, whether defense counsel provided ineffective assistance is subject to a bifurcated standard of review, in which a reviewing court defers to the trial court's findings of fact unless they are against the manifest weight of the evidence but assesses *de novo* the ultimate legal issue of whether counsel's omission establishes an ineffective-assistance claim. *People v. Payne*, 2015 IL App (2d) 120856, ¶ 19. Since the relevant facts here are undisputed, our review is *de novo*. *Id*.

¶ 54    We agree with the State that the defense opened the door to the State's questions about the reliability of the GSR test. When a defendant " 'procures, invites or acquiesces in the admission of evidence,' " he or she may not then complain that its admission was improper. *People v. Payne*, 98 Ill. 2d 45, 50 (1983) (quoting *People v. Burage*, 23 Ill. 2d 280, 283 (1961)). For instance, in *People v. Jefferson*, 2021 IL App (2d) 190179, we held that where the defendant, on direct examination of a police officer, solicited testimony of hearsay declarations of two eyewitnesses, the defendant could not fairly raise a hearsay objection to the State's eliciting further statements from the same conversations with the same two witnesses. *Id.* ¶ 39. Here, the defense sought hearsay from Gonzalez concerning the results of the GSR test, and so it cannot complain that the State brought out more detail through hearsay on the same subject.

¶ 55    Next, we agree with defendant that his testimony that Bransdor was screaming that she wanted to kill herself was admissible for a nonhearsay purpose, but defendant is mistaken that trial counsel did not argue for admission on that nonhearsay basis. That said, trial counsel did not raise the matter in her posttrial motion. However, we conclude that the omission did not prejudice defendant.

¶ 56    Defendant's attempted testimony that Bransdor was yelling about wanting to kill herself was admissible as tending to show that defendant could have reasonably believed that he was acting to prevent Bransdor from harming herself. Under Illinois Rule of Evidence 801(c) (eff. Oct. 15, 2015), " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, *offered in evidence to prove the truth of the matter asserted*." (Emphasis added.) Defendant raised the defense that he was acting out of necessity to prevent Bransdor from killing herself. Illinois's statutory defense of necessary states:

"Conduct which would otherwise be an offense is justifiable by reason of necessity if the accused was without blame in occasioning or developing the situation and *reasonably believed* such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct." (Emphasis added.) 720 ILCS 5/7-13 (West 2018).

Thus, regardless of its truth, Bransdor's out-of-court statement that she wanted to kill herself was relevant to show that defendant reasonably believed that Bransdor intended to kill herself.

¶ 57 Defendant is mistaken, however, that trial counsel did not properly argue for admission of his testimony about Bransdor's statement. When the State objected to defendant's testimony, trial counsel argued, "I think this also goes to necessity and why he [tackled her]. I think I should be able to get into what she was doing and saying that prompted him to grab her." Thus, contrary to defendant's claim on appeal, trial counsel did argue that Bransdor's statements had a nonhearsay purpose.

¶ 58 The State argues, however, that "defendant's entire defense hinged on his theory that [Bransdor's] alleged statement *was truthful*, and he was therefore justified in possessing the gun in order to prevent [Bransdor] from killing herself." (Emphasis in original.) It thus asserts that any statement Bransdor made about intending to kill herself was admissible only for its truth. This assertion is inconsistent with the nature of the necessity defense, as shown.

¶ 59 To be sure, trial counsel did not preserve the issue in her posttrial motion, thus potentially forfeiting it for appeal. See, *e.g.*, *People v. Baez*, 241 Ill. 2d 44, 129 (2011) ("To preserve a claim of error for appeal, a defendant must object at trial and include the claim in a written posttrial motion."). However, we agree with the State that the omission did not prejudice defendant. Given the other evidence tending to show that defendant might have believed that Bransdor intended to

shoot herself, admission of the testimony at issue would not have created a reasonable probability of a different outcome. Defendant would have testified to a statement Bransdor made *after* defendant took the gun from her. Such testimony was of limited relevance. The necessity defense rested on the claim that defendant reasonably believed that it was necessary to take the gun from Bransdor to keep her from injuring herself. What she said after defendant took the gun has little bearing on what he reasonably believed before he took the gun. Moreover, trial counsel introduced evidence that defendant believed that Bransdor was acting suicidal when he took the gun from her. For example, defendant testified that Alvarado told him via Snapchat that Bransdor was drunk, had threatened suicide, and had "already shot a gun off in the house." In defendant's theory of the case, that conversation was the reason that defendant went to Bransdor's house and confronted her. It is hard to see how the jury's assessment of this conversation would be impacted by defendant's uncorroborated report of Bransdor's later statements.

¶ 60    Finally, defendant contends that trial counsel failed to make a reasonable investigation of Alvarado and Eskildsen as potential witnesses. He concedes that trial counsel made multiple attempts to contact both witnesses but argues that this was not enough:

> "The prosecution deals with uncooperative witnesses on a regular basis, and it is not an excuse for a defense attorney to claim that unanswered phone calls trump the duty to investigate. If [Alvarado and Eskildsen] were 'important' witnesses, as [trial counsel] stated they were, then she had a duty to interview them to learn what they knew. It was objectively unreasonable that she did not."

Defendant suggests that, under *Strickland*, if a witness will not talk to counsel, counsel must subpoena the witness and conduct an interview when that witness appears for trial.

¶ 61    "To satisfy the deficient performance prong of *Strickland*, a defendant must \*\*\*overcome the strong presumption that any challenged action or inaction may have been the product of sound trial strategy" and is "a high bar to clear since matters of trial strategy are generally immune from claims of ineffective assistance of counsel." *People v. Dupree*, 2018 IL 122307, ¶ 44. To show prejudice, a defendant must demonstrate a reasonable probability that that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Id*. (citing *Strickland*, 466 U.S. at 688). The failure to prove either prong is fatal to an ineffectiveness claim. *Id*.

We will address prejudice first. According to defendant "[Alvarado] was an eyewitness to everything leading up to the events, including [Bransdor's] intoxication and belligerence, while [Eskildsen] would have impeached [Bransdor] on the source of the gun." We disagree with defendant's assessment. As noted above, notarized statements from Alvarado and Eskildsen were attached to defendant's second amended *Krankel* motion. In his statement, Alvarado averred that he went outside to smoke a cigarette leaving defendant and Bransdor inside the house. Then, as Alvarado "lit[ ] his cigarette" he "heard what sounded like two gunshots." After "[a]bout a minute" Alvarado saw defendant walk outside alone. Still Alvarado was candid about what he saw and recalled, stating, "I don't really remember anything after that except that the Carpentersville Police show up soon after the gunshots were fired and I felt at that time it was in everyone's best interest not to answer any questions to the police."

¶ 62    Contrary to defendant's claim, Alvarado's statement was not especially probative. Rather, the statement indicates Alvarado was *not* inside the house either during defendant's struggle with Bransdor or when the gun was fired. Consequently, Alvarado's testimony could not have bolstered

defendant's necessity defense as Alvarado was not there to observe the event defendant claims was necessary.

¶ 63    Eskildsen's statement was even more remote. It reads, in full:

"Carol [Bransdor] told me the gun was already in the kitchen before chad [*sic*] got there. Tony [Alvarado] Told [*sic*] me carol [*sic*] was the one who took the gun from the drawer in the kitchen."

This statement, too, was unilluminating. Eskildsen's affidavit is dated almost three years after the shooting; he never stated when he spoke to Bransdor or Alvarado, and Eskildsen was not at Bransdor's house that night. Moreover, even if the gun was Bransdor's, and even if Bransdor took it out of a kitchen drawer, as Eskildsen claimed she said, that information would have been of no moment. By their own admission, neither Alvarado or Eskildsen were in a position to observe the circumstances under which defendant came into possession of the gun that night. Contrast that with the unequivocal testimony from T.M. who heard defendant yelling, saw the gun in defendant's hand, saw defendant point the gun at her mother's head, saw defendant grab her mother by the throat, saw defendant shoot the wall, and then heard defendant threaten to kill her mother in the living room. It bears mention that unlike Bransdor, defendant, or even Alavarado, T.M. was the only witness present that night who was *not* intoxicated and would have no apparent motive to lie. Consequently, there was no reasonable probability that Alvarado's or Eskildsen's testimony would have altered the result of defendant's trial, and counsel could not have been ineffective for failing to secure their appearances.

¶ 64    We close with one final observation. Although we have elected to resolve the ineffective assistance claim on grounds that there was no prejudice to defendant, aspects of trial counsel's statements to the court raised a concern about her performance. In particular, trial counsel's

statement that she did not send an investigator to find Eskildsen because she did not believe defendant could afford the investigator's fees was puzzling. Trial counsel is not inexperienced and assuredly knows that the court has the inherent authority to order the payment of reasonable investigative fees upon request. See *People v. Rhode*, 219 Ill. App. 3d 1079 (1991). That said, counsel also indicated that Eskilden was defendant's friend and that Eskildsen had previously indicated that he would cooperate with the defense and appear voluntarily, rendering a subpoena, in her opinion, unnecessary. And then, of course, when it came time for trial, Eskildsen was nowhere to be found and did not return counsel's calls.

¶ 65    This would hardly be the first time a party was disappointed by a witness's failure to appear, but counsel's explanation was, nevertheless, concerning because funds to secure necessary witnesses certainly are available. From his affidavit, we know *now* that Eskildsen's testimony would have done little for defendant's case, but it would have been difficult to make that assessment prior to trial without locating and interviewing Eskildsen in the first place.

¶ 66                                    III. CONCLUSION

¶ 67    For the reasons stated, we reject defendant's claims of ineffective assistance of counsel and affirm the judgment of the circuit court of Kane County.

¶ 68    Affirmed.