2022 IL App (2d) 210018-U
No. 2-21-0018
Order filed August 16, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19 CF 862 |
| WILLIE A. BELL, | ) ) ) | Honorable Daniel B. Shanes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE McLAREN delivered the judgment of the court.
Justices Hutchinson and Brennan concurred in the judgment.

**ORDER**.

¶ 1     *Held*: Defendant failed to make a *prima facie* case under *Batson v. Kentucky* that the State's preemptory challenges to two African American female jurors were based on race. Three of the seven *Batson* factors weighed somewhat in favor of defendant's challenge, while the remaining factors were neutral or weighed against the challenge.

¶ 2     After a jury trial, defendant, Willie A. Bell, was convicted of one count of aggravated discharge of a firearm against a peace officer (720 ILCS 5/24-1.2(a)(3) (West 2018)) and two counts of aggravated discharge of a firearm (*id.* § 5/24-1.2(a)(2)) and sentenced to concurrent prison terms of 37 years, 26 years, and 26 years, respectively. On appeal, he contends that this

court must remand for a new hearing under *Batson v. Kentucky*, 476 U.S. 79 (1986) because he made a *prima facie* case of racial discrimination in jury selection. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     During *voir dire*, the court and the parties referred to prospective jurors by their numbers. The jurors directly involved in the *Batson* proceeding at issue here were jurors 100 and 107.

¶ 5     Initially, the court asked whether any of the prospective jurors, their family members, or close friends were ever accused of, or the victim of, a serious crime. Juror 100 told the court that, in the last year, her brother was murdered. A person had been charged but the trial was still pending. Juror 100 did not believe that she would need to attend the trial. She stated that the case involving her brother's murder would not influence her decision as a juror in this case.

¶ 6     The parties and the court then questioned prospective jurors from the initial panel of 20. Juror 100 stated that she worked in a Target store and was in charge of the Starbucks. She had been there a year. She had resided in Zion for 16 years and had attended Zion-Benton High School. She had two children, one age two who was in daycare and one age four who was in school. Juror 107 stated that she resided alone in Park City and had attended Zion-Benton High. She worked at a small casino in Waukegan, serving refreshments and sanitizing the machines.

¶ 7     The parties accepted juror 57, who was born in Pakistan. The State exercised peremptory strikes against jurors 59 and 139. Shortly afterward, the State exercised peremptory strikes against jurors 100, 103, and 107. The record does not reveal the races of jurors 59, 139, and 103. The proceeding continued:

     "MR. McKERLIE [(DEFENSE ATTORNEY)]: We would like to make a *Batson* challenge.

     THE COURT: To what?

MR. MCKERLIE: 100 and 107, these are the only two African-American ladies that were on jury [*sic*] and both of these jurors have been stricken by the State.

THE COURT: 100, do you believe she is African-American?

MR. McKERLIE: Yes, I believe I have in my notes, she appeared, Mexican braids. Her name, Number 100.

THE COURT: Jahda Berry.

MR. WEINSTEIN [(DEFENSE ATTORNEY)]: Number 107.

THE COURT: 107 appeared to be African [*sic*].

MR. McKERLIE: Karla Ridley. We would be asking the Court to inquire of the State as to why both of those parties are stricken."

¶ 8 The court then noted that, in a *Batson* challenge, the defendant must first establish a *prima facie* case that the facts gave rise to an inference of purposeful discrimination. See *Batson*, 476 U.S. at 96. The proceeding continued:

"[Mr. McKERLIE]: As previously stated, these are the only two African-American female jurors. There was an African-American male that was left on by the State.

These are the two African-American females. And for those reasons, that these are like the only African-American females, the argument for the Defense [*sic*]."

¶ 9 Weinstein added that jurors 100 and 107 had answered all questions appropriately and showed no signs of unfitness for duty.

¶ 10 The court turned to whether defendant had made a *prima facie* showing of discriminatory intent. The court noted that relevant considerations include a racial identity between the defendant and the challenged venire members, any pattern of exercising strikes against the allegedly discriminated-against group, whether peremptory strikes were used disproportionately against that

group, the level of minority representation in the entire venire, the prosecutor's statements and questions, "whether the excluded individuals were a heterogeneous group, sharing racism [*sic*], only common characteristic," and the races of the defendant, victim, and witnesses.

¶ 11    The court continued as follows:

> "Here, and without getting into identity politics, the Court's physical, visual observations of Juror 107 would seem to suggest that she is of African-American descent. That's what the Defense is suggesting. Okay.
>
> I'm not so sure about Juror 100. The court, also, or the Defense—I'm sorry, also noted Juror 19, who, I believe, the parties agree is of African-American decent [*sic*].
>
> He would appear to the Court to be such as well.
>
> The Court also notes that Juror 57 is by her own admission of Pakistani descent. She grew up there. She appears to be ethnically Pakistani, whatever that means.
>
> Juror 30 appears to be of some sort of Asian descent, perhaps Filipino or somewhere in that region of the world."

¶ 12    The court noted that, although *Batson* prohibits both racial and gender discrimination, it had found no authority for making African-American women a recognized group for *Batson* purposes. It found that the State's questions to jurors 100 and 107 did not show any discriminatory intent and differed little from the defense's questions. The court concluded that defendant had not made a *prima facie* showing, and it denied the *Batson* challenges.

¶ 13    Juror selection continued. The court told the parties:

> "The Court had an opportunity to look at Juror 100, again.

I understand why you brought the *Batson* challenge. Could be that she would identify that she is African-American, I don't know, but, in any event, it doesn't change the Court's analysis based upon the totality of the questioning and evidence and answers."

¶ 14 After a recess, juror 70, an African-American woman, was questioned in chambers. She stated that, the previous year, she had been charged with driving under the influence of alcohol (DUI). She had been tried and placed on supervision. She had no felonies. However, her older brother had been in and out of prison repeatedly and was currently serving a lengthy term for the robbery of a service station, in the course of which he shot a clerk. Her adopted brother had had several run-ins with the law. Her father had long been in and out of prison.

¶ 15 After other venire members were questioned, the proceeding returned to juror 70. She stated that she had recently become unemployed because of COVID-19 but had previously worked for 15 years with a hotel chain. Before the pandemic hit, she found a job in pet care.

¶ 16 After the 12 jurors were selected, there came *voir dire* for alternate jurors. Each party received a peremptory strike. After the first alternate juror was chosen, juror 70 came up as a prospective alternate. The State exercised a peremptory strike against her, based on her responses to the private questioning. Defendant made a *Batson* challenge, stating that of the four African-Americans in the venire, the State had made peremptory strikes against three.

¶ 17 The court asked the State for argument on whether defendant had made a *prima facie* showing. The State argued that its questions to juror 70 were similar to those to other venire persons and that she and her family had been heavily involved in the criminal justice system, especially in Lake County. The court agreed, observing that juror 70 and her family had been "swimming in this criminal justice system for generations." Although the State had not challenged juror 70 for cause, there would have been sufficient cause in that the State could petition to revoke

her supervision for DUI and thus expose her to potential jail time, which could influence her as a juror. And, "if there are grounds for cause, then we never get to *Batson*." *Voir dire* soon concluded.

¶ 18    After the jury trial, defendant was convicted of one count of aggravated discharge of a firearm against a peace officer and two counts of aggravated discharge of a firearm. In moving for a new trial, he raised the *Batson* issue summarily but did not argue it at the hearing on the motion. The trial court denied the motion and sentenced defendant to concurrent prison terms of 37 years for the first conviction and 26 years for the other two. This timely appeal followed.

¶ 19                                   II. ANALYSIS

¶ 20    On appeal, defendant contends that the trial court erred in rejecting his *Batson* challenge to jurors 100 and 107. Defendant argues that the court misapplied the law and that he met *Batson*'s threshold for a *prima facie* showing of discriminatory intent, thus shifting the burden to the State.

¶ 21    We note that, although defendant at some points argued to the trial court that the State was discriminating against African-American women, his claim on appeal is limited to race-based exclusion. Further, although defendant raised a *Batson* challenge to the exclusion of juror 70, he does not do so here  (although he refers to the proceedings as to juror 70 in some respects). Thus, we consider only whether defendant established a *prima facie* case of impermissible race-based exclusion of juror 100 or 107.

¶ 22    The State may not use its peremptory challenges to exclude otherwise qualified venire members from the jury based solely on their race. *Batson*, 46 U.S. at 89; *People v. Payne*, 2015 IL App (2d) 120856, ¶ 42. *Batson* challenges are subject to a three-step process. First, the defendant must make a *prima facie* showing that the State exercised a race-based peremptory challenge. *Batson*, 476 U.S. at 96; *People v. Easley*, 192 Ill. 2d 307, 323 (2000). To do so, the

defendant must demonstrate that relevant circumstances raise an inference of purposeful discrimination based on race. *Batson*, 476 U.S. at 96; *Payne*, 2015 IL App (2d) 120856, ¶ 42. Among such circumstances are (1) racial identity between the defendant and the excluded potential juror(s), (2) a pattern of strikes against those in the alleged racial group, (3) a disproportionate use of peremptory strikes against members of that group, (4) the level of representation of the group in the venire versus their representation in the jury, (5) the prosecutors' questions and statements during the *voir dire* and while exercising the peremptory strikes, (6) whether the stricken jurors belonged to a heterogeneous group with race as their only common characteristic, and (7) the race of the defendant, witnesses, and victims. *People v. Williams*, 173 Ill. 2d 48, 71 (1996).

¶ 23   If the trial court finds that the defendant has established a *prima facie* case, the burden shifts to the State to articulate a race-neutral explanation for excluding each venire member in question, subject to any rebuttal by the defendant. *Batson*, 476 U.S. at 97; *Easley*, 192 Ill. 2d at 323-24.   At the third stage, the court decides whether the defendant has proved purposeful discrimination. *Easley*, 192 Ill. 2d at 324.

¶ 24   "Because the trial court is in a superior position to assess and evaluate the credibility of those involved in the proceeding, a trial court's determination with respect to a defendant's *Batson* claim is entitled to great deference and will be disturbed on appeal only if manifestly erroneous." *People v. Wiley*, 165 Ill. 2d 259, 274, (1995).   Therefore, any ambiguities in the record, such as those pertaining to the race of a venire member, must be resolved against the defendant. *People v. Johnson*, 183 Ill. 2d. 176, 190 (1998).

¶ 25   We turn to the challenges to jurors 100 and 107.  Defendant contends first that the trial court misapplied *Batson* by failing to focus on the specific group against which he alleged discrimination—African-Americans—and instead focusing on whether certain venire members

belonged to various nationalities. Defendant notes the court's comments that juror 57 appeared to be "ethnically Pakistani, whatever that means" and that juror 30 appeared to be "of some sort of Asian descent, perhaps Filipino." Further, the court observed that, in addition to striking jurors 100 and 107, the State also struck "non-minority members of the panel."

¶ 26 We agree with defendant to the extent that the foregoing references were not germane to the *Batson* analysis, given that defendant was contending that the State was discriminating against certain venire members based on their race, not their national origin. However, reading the report of the *voir dire* as a whole, we conclude that any error was harmless. In applying the *Batson* test, the court understood that the issue was racial discrimination, and it properly analyzed defendant's claim on that basis. Moreover, in referring to "non-minority members of the panel," the court was necessarily referring to members who were not African-American. In any event, we review the court's judgment, not its reasoning (*People v. Mueller*, 2018 IL App (2d) 170863, ¶ 16), and we shall evaluate defendant's argument accordingly.

¶ 27 We consider the *Batson* factors in turn, keeping in mind that they are not necessarily exclusive and that the fundamental question is not how many factors may be ticked off on each side but whether, as a whole, the record supports disturbing the trial court's ultimate finding.

¶ 28 The first factor—the defendant's race and that of the prospective jurors—favors defendant. The court agreed that defendant is African-American as was at least one, and likely both, of the stricken jurors. Moreover, the court stated that its decision would have been the same whether or not both jurors 100 and 107 belonged to the same race as defendant.

¶ 29 The application of the second factor—whether there was a pattern of strikes against African-American members of the venire—is of ambiguous import. It is difficult to characterize

two peremptory challenges against members of a particular group as a "pattern," even among a relatively small number of peremptory challenges in total. We consider this factor neutral.

¶ 30    The application of the third factor—whether a disproportionate number of peremptory strikes were made against African-Americans in the venire—requires a more detailed analysis. The parties agree that the total venire consisted of 40 prospective jurors. Also, at the time of the *Batson* challenge, the State had exercised two peremptory strikes against African-Americans (jurors 100 and 107) and three peremptory strikes against jurors 59, 103, and 139, whose racial identity is not evident from the record, meaning that we must presume that they were not African-American (*Johnson*, 183 Ill. 2d. at 190). Of the remaining venire members, we know only that one, whom the State accepted, was an African-American male. We do not know the racial identities of the remaining jurors other than juror 70, who had not yet been excluded.

¶ 31    Defendant also notes that, after the trial court resolved the *Batson* challenge to the exclusion of jurors 100 and 107, the State used three peremptory strikes against potential alternate jurors, including juror 70 and two jurors whose racial identities are unknown from the record. The trial court concluded that juror 70 would properly have been stricken for cause. On appeal, defendant does not contest this conclusion. Thus, to the extent that the State's use of peremptory strikes long after the ones against jurors 100 and 107 sheds any light on its intention earlier (a difficult matter), it does not aid defendant. Before the *Batson* ruling at issue, the State had used three of five peremptory strikes, or 60%, against African-Americans. In all, the State used four of eight peremptory strikes, or 50%, against African-Americans, and one of these strikes was supported by a race-neutral reason that the trial court accepted in full. We conclude that the third factor militates somewhat in favor of defendant, but by no means compellingly.

¶ 32    We turn to the application of the fourth factor—the level of representation of African-Americans in the venire compared to the level of representation in the final jury.  In this regard, we know that there were 40 people in the venire and 12 jurors plus two alternates.  However, the record reveals no more than four venire members whom we know to be African-American and no more than one African-American whom we know to have served on the 12-person jury.  Thus, as best we can say, the venire was 10% African-American and the jury was 8.5% African-American.  Counting the two alternate jurors, we can lower the latter figure to 7.3%.  The disproportionality between the percentage of African-Americans in the venire and the percentage on the jury is not trivial, but the lowest figure of the three is still 73% of the highest.  This factor can be taken to indicate discriminatory intent, but it is far from compelling.

¶ 33    As to the application of the fifth factor—the questions that the prosecutor asked the venire members—the trial court correctly noted that jurors 100 and 107 were asked the same questions as were the other venire members.  Therefore, this factor favors the State.

¶ 34    The application of the sixth factor—whether the stricken jurors belonged to a heterogeneous group having nothing significant in common but race—is less clear.  Partly this is because it involves only two stricken jurors; thus, the relative absence of common characteristics besides race is not altogether remarkable.  Nonetheless, jurors 100 and 107 did have some nonracial characteristics in common: both were female, had attended Zion-Benton High School, and worked in service jobs that involved regularly serving food and drink to members of the general public.  On the other hand, juror 100 had two small children, and her brother had been murdered recently, while juror 107 lived alone, had no children, and did not state that anyone close to her had been the victim of a crime.  The ages of these two venire members are not apparent from the record and, unlike the trial court and the attorneys, we cannot estimate their ages by their

appearance. Given the mix of similarities and differences, and the limited information of record, we find this factor neutral.

¶ 35 The seventh and final factor—the racial identities of the defendant, witnesses, and victims—is one on which defendant did not rely at any stage of the trial and does not cite on appeal. Therefore, he has forfeited reliance on this factor, and, by default, it must be counted against him. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (points not argued are forfeited).

¶ 36 Summarizing the results of our analysis, we find that of the seven *Batson* factors, only the first, third, and fourth favored the *Batson* challenges to jurors 100 and 107, and these did not do so with great force. The remaining four factors were neutral or unfavorable. Moving from the trees to the forest, we cannot say that the overall circumstances warrant a conclusion that the trial court's rejection of the *Batson* challenges was manifestly erroneous. *Wiley*, 165 Ill. 2d at 274. Therefore, defendant's appeal fails.

¶ 37                              III. CONCLUSION

¶ 38 For the foregoing reasons, we affirm the judgment of the circuit court of Lake County.

¶ 39 Affirmed.